Good morning, Your Honors. May it please the Court, my name is Ben Garagosli. I'm from the Law Office of Ramin Gashgai, Counsel for the Petitioner, Mr. Zadesmaeil. At this time, I would respectfully request to reserve three minutes for a rebuttal argument. Please try to keep track of your own. I'll try also, so between the two of us we make it. Yes, sir. Your Honors, this case is principally concerned with two issues. The first is whether the VIA, the Board of Immigration Appeals, should be prohibited from hijacking the right of an immigration judge to make a first instance credibility finding. And second, whether meeting the required 10 percent threshold is sufficient for an asylum grant. With respect to the first issue, the government in its brief vehemently argues that the immigration judge made an explicit adverse credibility finding in the merits hearing. With due respect to the government, this is simply not true. The only judicial body in this instance that made a first instance adverse credibility finding was the Board of Immigration Appeals. The immigration judge in this matter at most made a passing implicit observation as to my client's credibility. Pursuant to this Court's holding in Menembo v. Ashcroft, this is not a credibility finding. This Court further went on in that case to indicate that the VIA is not permitted to make first instance adverse credibility findings. Here, because the immigration judge made no such finding, the VIA engaged in an egregious abuse of discretion in doing so. In fact, the immigration judge essentially indicated the Ninth Circuit's jurisprudence is irrelevant in determining, well, in this case, discussing credibility. She – this is quite, well, convenient as many of her observations as well as the observations of the VIA flew in the face of this Court's jurisprudence with respect to credibility. The government points to three different issues with respect to credibility. First, the alleged discrepancy between shot versus assassinated. Second, the date of the raid, whether it occurred in August or September of 2001. And finally, the summons. As to the first issue, the word assassinate was the word of the translator, not my client. My client prepared a declaration in the Farsi language in support of his asylum declaration. There was no determination at the merits hearing whether or not this translation was indeed accurate. And further, the immigration judge did not, although Judge Munoz had the opportunity to do so, did not challenge this alleged discrepancy. Further, I should note that this Court's holding in Shaw v. INS at 220 F3d 1015, pin site 1071, indicated there must be substantial evidence to support an adverse credibility finding. This Court further went on to indicate that minor inconsistencies that do not go to the heart of the claim and are based on speculation do not support an adverse credibility finding. The date of the raid is also minor. Further, the – this Court dealt with the issue of Persian versus Western calendar translations as not being a basis for adverse credibility findings in Kebede v. Ashcroft. That's at 366 F3d 808, pin site 811. It was decided in 2004. As to the summons, the alleged inconsistency is whether – is why did the government of Iran ask my client to present himself at Evin Prison with a copy of his birth certificate – excuse me, with the original birth certificate if they had taken this from the raid. This, Your Honors, is not attributable to my client. My client should not be made to explain the carelessness of the Iranian official that prepared the summons for him. Persecutors, after all, are not always logical. So assuming that – assuming your client's testimony is credible, how do you deal with the IJ finding that what happened with the raid doesn't rise to the level of persecution within the meaning of the INA? Yes, Your Honor. I realize the BIA didn't reach that issue, but I'm curious as to your view. Of course, Your Honor. This Court in Gwobe Ashcroft 361 F3d 1194 held that the cumulative effect of harms and abuses which might not individually rise to the level of persecution may cumulatively support an asylum claim. Here, there are four pieces of evidence that rise to the level of the 10 percent threshold in establishing future persecution pursuant to this Court's holding in El Hemry v. Ashcroft. The first is, as Your Honor indicated, the home raid by government agents. The second is the fact that my client worked for a newspaper which was shut down by government officials and whose membership and leadership were violently targeted, whether shot or assassinated, by government officials. Third, my client was issued a summons to present himself to Evin Prison, which is an internationally recognized torture house rampant with human rights abuses. And finally, my client converted out of Islam. This is punishable by death under the Iranian penal code. And this is supported not only by the documents that we submitted, but also by the documents submitted by the government in the State Department report, which clearly notes that to convert out of Islam, as my client has done in this case, rises to the level of punishment by death. And sure ---- Your answer is talking about future persecution. I understand that. Are you conceding that there is not enough evidence in the record, even assuming your client is deemed credible, to support a finding of past persecution? I'm not necessarily conceding that, Your Honor. However, I would like to note that while past ---- the demonstration of past persecution is probative in determining future persecution. Well, it creates a presumption. That's why it's important. That's why I'm curious. Why would you think that the ---- I think the only issue of past persecution would be the raid. Yes, Your Honor. And do you have anything that indicates that that would rise to the level of what would be termed persecution under the INA? Well, to have one's home raided, Your Honor, without due process, would likely rise to the level of persecution. But I would like to note that, Your Honor, that even if he was not able to demonstrate past persecution, he has certainly met the 10 percent threshold requirement in establishing future persecution. Your Honors, I see that I'm about done with my seven minutes. Thank you. Thank you. May it please the Court, my name is Lance Kelly. I represent the Respondent, the U.S. Attorney General. To briefly address your point, it seems that on page 12 of Petitioner's brief he states, the Petitioner does not contend that the events which occurred to him in the past amount to a showing of past persecution. So it would appear that he has conceded the past persecution aspect of this case. Substantial evidence supports the agency's average credibility finding and finding that there is no well-founded fear of future persecution. As to credibility, there are material discrepancies between his testimony and the evidence that he presented. In his declaration, he declared that his boss at the newspaper had been assassinated. But in his testimony, he only testified that he had been shot and that he had recovered. This is a significant omission, as assassinate would indicate the editor had died. And it's related to his claim of what the government would do to him. In his declaration, he stated that fortunately he was able to get out of the situation alive. And his well-founded fear claim is also based on his work for the newspaper. And so the assassination or shooting of the editor would indicate that it's a significant aspect of his claim. And Fischer raises the possibility that there is a translation error in his declaration concerning assassination. But the mere possibility of a translation error is not enough. He would have to actually give us alternate definitions of the word and farce he used to indicate how that would be a translation error. The second discrepancy is concerning when the government raided his house. Again, in his declaration, he stated that it was in August 2001. But before the immigration judge, he testified that it happened on September 10, 2001. And time was spent in the hearing tying it to September 11, 2001. And when you can tie an event to another important event, according to Jarnail Singh v. Gonzalez, a discrepancy in dates supports an adverse credibility finding. And the third adverse credibility discrepancy is with regards to the summons. Petitioner first claimed that he would be able to get the original birth certificate, but he then later claimed that the birth certificate had been confiscated. He then at first stated- Why did I go to the heart of the claim? As opposed to- as to the summons. The summons- Yes. Yes, in fact. And so it's related to the summons and the fact that when he testified that he would be able to get the original of the summons and that the summons didn't say he needed the birth certificate. Right. But this is pre-real ID Act, so it has to go to the heart of the claim. So my question is why is that particular discrepancy- how does that go to the heart of the claim? Okay. If the adverse credibility finding was just based on the discrepancy on the concern of the birth certificate, you're correct. So that one doesn't- You can see that that doesn't go to the heart of the claim. It probably supports the inconsistencies with regards to the summons, and the summons would go to the heart of the claim. He claimed that the summons was lost in the mail, but there's no evidence as to the loss in the mail. He did not submit any sort of declaration. Right. I guess my question is why does activity that occurs long after the events he complains of go to the heart of his asylum claim? The summons goes to the heart of his claim. So any inconsistency regarding the summons would also go to the heart of his claim. I'm asking you why the summons, which happens long after the events of which he complains, go to the heart of his claim. Why does that go to the heart of his claim? I realize post-real ID Act, different story probably. His claim for well-founded fear of future persecution is that the government is interested in him based on the summons. That's his evidence, that the government is interested in him, which is the basis of his well-founded fear claim. So that is his claim. And inconsistencies regarding the summons go to the heart of the claim because the summons is basically the heart of his well-founded fear claim. Let me ask you this. You've heard Petitioner's argument, you read his brief, about whether or not the IJ has actually made an express adverse credibility finding. And I've read the briefs on the IJ's decision. And it doesn't appear to me that the IJ actually used the words that we would usually see when we see an adverse credibility finding. It undermines his credibility, but what you've said is not enough. So what words would you point me to that would indicate that the IJ actually made an adverse credibility finding? First, the IJ stated that the threshold issue is credibility. Right. And then he said that the next sentence is that there are significant discrepancies. And if you read in the context of the immigration judge's decision, he separates these adverse credibility concerns from the well-founded fear claim. Right. But usually, and this is, again, pre-real I.D. At the end of all of that, you would have normally an IJ saying, for these reasons, I do not find the petitioner credible. Instead, here, what the IJ says is this. All of these undermine the respondent and plausibility of the respondent's statement. Now, usually we've held in these pre-real I.D. Actually, that's not enough to be an express credibility finding. So can you help me with that? Our position is that if you look at the context under Leon Barrios and the clear separation of credibility concerns, it's evident that it is an explicit. And in any event, in the petitioner's notice of appeal, he recognized it as an adverse credibility finding. And the issues he raised in defense of his claim in his brief before the board, he addressed those discrepancies. And so the board understandably understood the IJ's immigration judge's finding as an adverse credibility finding. It's not as if the board is making it on its own. The immigration judge made adverse credibility like at least determinations, and the board interpreted the immigration judge's decision as an adverse credibility finding. It didn't make an adverse credibility finding out of whole cloth. The board just merely understood what the immigration judge was saying in the context of immigration. You have two minutes. Do you want to discuss the religious persecution claim? Sure. What's wrong with the claim that he has a well-founded fear of future persecution? Based on his religion? Yeah. All right. When the immigration judge attempted to explore the differences between the Ekinkar and Muslim faith, petitioner testified that they're all close, that they're all kind of the same. The attorney, I believe, explained that Ekinkar doesn't have a prophet. His testimony is more that Ekinkar was complementary to Islam. And on appeal and before this court, all he has said that his conversion to Ekinkar, point blank, is an apostasy from Islam and supports a well-founded fear. He hasn't established, A, that the record does not establish that it is considered apostasy. State Department reports don't list Ekinkar religion. And so without more, it cannot be said that the record does not compel the conclusion that the Iranian government would consider him as an apostate. Are you saying we can't conclude based on this record that Ekinkar and Islam are different religions? They're different religions, yes. And isn't it also the case that Iranian law demands the death penalty for an apostate? Correct. So isn't that enough to establish that he fears being killed if he's returned to Iran? I would say no. That is not clear. He could have presented testimony from some sort of Islamian source, but the only evidence in the record is that when he testified was that they were basically complementary. And just asserting a fear without more does not compel the conclusion. And as my time is up, the Court should deny the petition for review unless the Court has further questions.  Your Honors, good morning again. I would note that the opinion of whether or not, of my client, whether or not Ekinkar and Islam are two different religions is not relevant. What is relevant is that the person... What did he say? He said they're different, but they complement each other. Yes, Your Honor, they complement each other, but... And doesn't the Baha'i religion also complement the... in the same way complement Muslim religion? Yes, Your Honor, and the Baha'i faith, as indicated in the State Department report, have been viciously and mercilessly persecuted by the Iranian government simply because... And the Baha'i... Yes. Excuse me, go ahead. Simply because what? Well, Your Honor, both Baha'i and Ekinkar faiths appear to recognize the legitimacy of the Prophet Muhammad, as does Islam. However, the Iranian authorities, not always being the most logical individuals, nevertheless persecute individuals of these faiths, even though there are significant overlaps. It is what the government of Iran would likely do to these individuals who've converted out of the faith. The Baha'i faith and Ekinkar both recognize more than one supreme being or whatever they call the three faiths? My understanding, Your Honor, is that Ekinkar and Baha'ism are both not Abrahamic faiths, and they are Unitarian faiths that recognize more or less all of the Prophets, and I'm going off of what my client testified at the hearing and from the rest of the record. However, regardless of whether or not it recognizes Muhammad or not, the government has essentially conceded that to convert out of Islam constitutes apostasy. Apostasy is punishable by death under the Iranian penal code. This, I believe, is more than enough to meet the 10% threshold for asylum claims. Further, I would note that the government counsel noted that he did not explain that the summons was lost in the mail or presented any evidence thereof. How could my client present evidence that the summons was lost in the mail? Unless he could track down the postage or the certification number that it was sent with, I don't see how that is even possible. I believe that the discrepancies with respect to the dates are more than addressed in this Court's holding in Kebede, where it noted that the differences in the two Western and Persian calendars are not a basis for an adverse credibility finding. In short, Your Honor, the denial of Mr. Zaid Ismail's asylum application constituted an abuse of discretion because it ignored the Court's – this Court's case law on persons and the fact the petitioner met his 10% threshold for asylum. Thank you, counsel. Thank you, Your Honor. The case is here. It will be submitted.
judges: Sedwick, Reinhardt, Thomas